J. R. HALE & SONS v. R. C. STONE ENGINEERING COMPANY et al.

Middle Section. January 30, 1932.

Petition for Certiorari denied by Supreme Court, June 4, 1932.

Walter Stokes, of Nashville, for appellants.

Wm. M. Hall, of Memphis and Albert W. Stockell, of Nashville, for appellee.

DeWITT, J. Complainants W. T. Hale, Jr. and R. W. Hale, composing the partnership of J. R. Hale & Sons, filed the bill in this cause on January 28, 1927, against R. C. Stone Engineering Company and Aetna Casualty & Surety Company, to recover damages in the sum of $60,000 for the breach of a contract entered into on September 23, 1924, between J. R. Hale & Sons and R. C. Stone Engineering Company for the erection of a reinforced concrete storage annex to the complainants' grain elevator, including an oat bleacher, at Nashville, Tennessee. The recovery sought of the Aetna Casualty and Surety Company was predicated upon two bonds in the sum of $28,000 each, executed to the complainants by the Stone Engineering Company as principal, and the Aetna Casualty & Surety Company as surety.

The defendant R. C. Stone Engineering Company was alleged to be a non-resident corporation. No personal service of process was had upon it and no attachment was issued and levied on any property belonging to it. It was brought before the court only by publication, and therefore no personal judgment could be rendered against it.

Upon the hearing upon a voluminous record, the Chancellor sustained the pleas in the answer of the Aetna Casualty & Surety Company that the complainants' right of action was barred because of the contractual limitations in each of the bonds. From his decree dismissing the bill the complainants have appealed and in this court they insist, first, that it was error to hold that complainants' right of action was barred because of the contractual limitations in the bonds sued upon, and second, that it was error not to hold that these contractual limitations had been waived by the Surety Company. So many provisions of the contract must hereinafter be discussed, that it is here shown, as follows:

"THIS AGREEMENT, made and entered into this 23rd day of September, A. D., 1924, by and between R. C. Stone Engineering Company a corporation organized under the laws of the State of Missouri, party of the First Part, hereinafter designated the Contractor, and J. R. Hale & Sons, a partnership doing business under the laws of the State of Tennessee, party of the second part, hereinafter designated as Owner,

"WITNESSETH, as follows:

"ARTICLE I: The Contractor shall and will provide all materials and perform all work, except as specified in Article II, necessary to the erection, complete and in operation, of a reinforced concrete storage annex, to the Owner's grain elevator, near Nashville, Tennessee, including an oat bleacher, all in strict accordance with the plans and specifications attached hereto, and which are a part of this agreement.

"ARTICLE II: The Owner agrees to furnish and erect at his own expense, the boiler and steam piping necessary for the oat bleacher. The Owner further agrees to furnish without cost to the Contractor, the cooling tank for the bleacher, also the pipe between the cooling tank and the bleacher, for sulphur fumes, which equipment the Contractor shall erect in place as a part of his work.

"ARTICLE III: The Owner has retained the John S. Metcalf Co., of Chicago, Illinois, hereinafter designated as the Engineer, to act in his interest as Consulting and Supervising Engineer, and the Contractor hereby recognizes and agrees to the full and complete jurisdiction of said John S. Metcalf Co., in

all matters or details pertaining to the work comprehended by this agreement.

"ARTICLE IV: The Contractor shall furnish all necessary working of shop drawings or details, which shall in each case receive the formal approval of the Engineer before any material is ordered or any work is done. The Engineer's representative on the site of the work shall inspect all materials received and all work done, and his judgment as to defective or inferior work or material shall be final. Any material rejected for cause shall be immediately removed from the site, and any defective work shall be replaced promptly, by the Contractor, without cost to the Owner.

"ARTICLE V: The Contractor agrees to start the work immediately upon the execution of this agreement, and to so expedite its progress that it will be substantially completed by January 1, 1925, so that the Owner may safely receive, ship, or store grain on that date, except however, that full time allowance shall be made to the Contractor for delays through causes beyond his reasonable control.

"ARTICLE VI: On the first and fifteenth of each month the Contractor shall prepare and deliver to the Engineer, an estimate of the value of the materials delivered, and work done, during the estimate period. The Engineer shall check said estimate promptly, and the Owner agrees to the immediate payment of eighty-five per cent of the amount of all such estimates bearing the Engineer's approval. The balance of fifteen per cent is to be retained by the Owner until completion and acceptance of the work. The Contractor agrees that no estimate submitted shall be greater in amount than the relation the completed work bears to the whole amount of the contract price.

"The Contractor also agrees to submit with each estimate receipted invoices and payrolls to the amount of said estimate.

"ARTICLE VII: The Owner agrees to pay for all work covered by this agreement, in the manner specified in Article VI the sum of $56,000 (FIFTY SIX THOUSAND DOLLARS) plus one-half the cost of the wiring and the fixtures necessary for the electric lights specified.

"ARTICLE VIII: The Contractor agrees that the annex shall have a storage capacity, without trimming, of 380,000 (three hundred and eighty thousand) bushels of wheat weighing sixty pounds per bushel.

"It is further mutually agreed that the undertakings hereof, and each and all of them, shall be binding upon the successors, administrators, or executors of the respective parties hereto.

"In testimony whereof, the parties hereto have executed this agreement, the days and year first above written.

"Witness;                     'R. C. Stone Eng. Co.,
"G. T. Butt,                   'By J. C. Stratton,
"Witness;                     'J. R. Hale & Sons,
"J. W. Perrigo.                'By W. T. Hale, Jr.''

This contract and the specifications provided for the construction of twenty-three concrete tanks for the storage of grain, "basement and conveyor tunnel, conveyor cupola above tanks, installing of belt conveyors and drives, power for same, all spouting to and from bins, connecting both belts to elevators in old elevator adjacent, both to receive in, to and from new tanks and building the bleacher.''

The specifications contained, among other provisions, the following:

"RESPONSIBILITY:

"The Contractor under these specifications, agrees to be held solely responsible for the laying out and proving up his work, and for the faithful execution of these specifications, and for any damage growing out of a failure to do so, and no exception through oversight or concealment or otherwise, or any imperfect workmanship or materials, shall ever relieve the contractor from responsibility. Neither the Owner nor the Superintendent shall be held in any event, to have assumed any responsibility in the matter.''

"The Superintendent referred to in this clause was employed by complainants to look after the work as it progressed.

" 'Said Specifications further provide:

" 'ACCEPTANCE OF WORK:

" 'When the contractor notifies the owners that the work has been completed in accordance with the drawings and specifications, the owners shall have the right of making any reasonable test they may desire. If these tests are satisfactory, the owners shall give the contractor a written acceptance of the work. If the tests are unsatisfactory, the owners shall give the contractor an acceptance when defects have been made good, according to the true meaning and intent of these specifications and drawings.

" 'FINAL:

" 'The drawings and these specifications are intended to include everything necessary, in order to secure a good workmanship and substantial job, complete and finished in all its details, and anything omitted and which is necessary in order to secure such a job, shall be considered as included in these specifications,

provided that the same is not specifically excepted in the specifications of this contract.

" 'BOND:

" 'The contractor shall furnish a Surety Bond in the sum of one-half amount of contract price.' "

The first bond, executed on October 1, 1924, provided indemnity to the complainants against any loss directly arising by reason of the failure of the R. C. Stone Engineering Company as contractor and principal to faithfully perform the said contract; with the condition "that no action, suit, or proceeding shall be had or maintained against the surety on this instrument, unless the same be brought or instituted and process served upon the surety within six months after the date or time fixed in said contract for the completion of the work mentioned therein, provided, however, if there is any maintenance or other guarantee in such contract obligating the principal for a period after the date of completion and acceptance of the work, any action, suit or proceeding for recovery of damages sustained by reason of the failure of the principal to perform the terms and conditions of such contract, pertaining to such maintenance or other guarantee, may be had or maintained against the surety on this instrument, if the same be brought or instituted and process served upon the surety therein within three months after the date of expiration of said maintenance or other guarantee."

This bond is known in the record as the Performance bond.

It will be seen that this bond contained a provision limiting to the period of six months after the date or time fixed in the contract for the completion of the work therein mentioned, the right to sue the surety on the bond. The time fixed for completion was January 1, 1925, but no complaint is made of the failure to complete the work by that date. In the latter part of February, 1925, the complainants were notified by the contractor that the work was completed and the tanks were ready to receive grain for storing. Thereupon the complainants proceeded to use the elevator for the purpose for which it was constructed, but did not formally accept it; and soon thereafter they began to insist that it was not completed satisfactorily so as to enable them safely to receive, ship or store grain. Sufficient time had not elapsed to develop any defects in material and workmanship. The complainants had paid to the contractor all of the contract price, excepting $11,598.86, which was payable when the contract would be completed and the work should be accepted. Some leaks in the basement soon developed, but these were finally eliminated. Whether or not these leaks were due to defective material or workmanship became a subject of controversy. The complainants appear to have

had at that time some apprehension lest the building might collapse, although there is no evidence of substantial danger thereof. As a precaution against the possibilities of collapse or of defects violative of the contract, and as a condition of paying out the balance of the money, the complainants required a second bond, which is referred to in the record as a maintenance bond.

We are clearly of the opinion that even if there were defects in the material or workmanship; even if the contract was not completed according to its provisions, the time of limitation for suit on the first bond expired not later than July 1, 1925, unless that provision was waived or the time was extended by agreement of the surety, to the date of the filing of the original bill in this cause. The period of limitation of six months was plainly and expressly to begin to run from "the date or time fixed in said contract for the completion of the work mentioned therein."

There was no provision in the contract or specifications for a maintenance bond, or a guaranty obligating the contractor for a period after the date of completion and acceptance of the work; and therefore the provision of the bond extending the period of limitation to the end of three months after the date of expiration of such maintenance or guaranty as might be in the contract did not come into operation.

The second bond, referred to in this record as the maintenance bond, was executed by the Aetna Casualty & Surety Company on April 21, 1925. This bond after referring to the original contract as obligating the contractor, "to provide all materials and perform all work necessary to the erection complete and in operation of a reinforced concrete storage annex to the complainants' grain elevator," was expressly conditioned, "that if the principal shall indemnify the obligee against any imperfect workmanship and defective material that may appear in said elevator within one year from the date said elevator is completed and ready to receive grain, said defects being due to any imperfect workmanship and defective material on the part of the principal, then this obligation shall be void, otherwise shall remain in full force and effect." The bond was in the sum of $28,000 and contained the following condition, "that no action, suit or proceeding shall be had or maintained against the surety on this instrument unless the same be brought or instituted and process served upon the surety within three months after the date of expiration of said guarantee period."

That the parties could validly thus by contract restrict the periods of limitation of actions upon the bonds is not open to question in this State. These were matters of contract not regulated by the terms of the statute of limitation. Guthrie v. Indemnity Association,

101 Tenn., 643, 49 S. W., 829; Humpston v. Insurance Co., 148 Tenn., 439, 468, 256 S. W., 438, 31 A. L. R., 78.

The complainants insist, however, that under the wording of the bonds, the limitations did not begin to run until the elevator was in such condition that it might "safely receive, ship or store grain;" that this was a condition precedent to the completion of the contract; that until such completion the contractual limitations did not begin to run; and that such completion, if ever made, was done within such period that the suit is not barred. It is further contended that the rule of construction of ambiguous clauses against the surety must be applied; that the surety is bound by an interpretation by the parties adverse to its present position; and that by its acts and conduct the surety waived the contractual limitations.

As to the first bond we have already stated a conclusion contrary to the insistence that the limitation did not begin to run until completion of the work—applying the provision that it would begin when the work should be completed at the date set in the contract—unless the limitation was waived or the time extended by the Surety. Under this view it is immaterial whether the second bond was a full substitute for the first, or was furnished as an additional security for the performance of the contract, unless there was a waiver or sufficient extension. In other words, if action on either of these bonds is barred by the limitation, this question is of no import whatever.

By the second bond the guaranty was made "against any imperfect workmanship and defective material that may appear in said elevator within one year from the date said elevator is completed and ready to receive grain." The limitation of action thereon was three months after the date of expiration of said period of one year The question here arising is, when, under the facts, did this period of one year begin? Did the complainants by their acts and conduct, accept the work as apparently completed and rely upon the second bond as security against loss from defects which might develop within a year? If so, when was such acceptance given?

Considerable correspondence was carried on between complainants and the Stone Engineering Company between March 7, 1925 and May 6, 1925 with reference to a settlement under the contract. On February 20, 1925 there was a balance of $11,598.86 due the Stone Engineering Company, payable upon the completion of the contract. Mr. W. T. Hale, Jr, was requested in person on that day by the Surety Company's agent in St. Louis to make a final settle-' ment with the Stone Engineering Company, and he stated to him that the Surety Company was perfectly willing to execute a maintenance bond. It appears that some leaks in the basement occurred and these were sought to be stopped. The aforesaid correspondence

related to this, to the matter of testing the elevators, to a settlement and to the furnishing of the second bond. On April 17, 1925, Mr. R. C. Stone visited Nashville and in company with his superintendent, Mr. Grant, sought a settlement from complainants, but they insisted on the execution of a second bond. On April 21, 1925, Mr. Mead, the Surety Company's manager, in St. Louis, wrote complainants that Mr. Stone had informed him that he had completed the contract and all bills had been paid; that if the complainants were satisfied that the elevator had been completed in accordance with Mr. Stone's statement, they should make final settlement to him; that the thing to do was to make such payments on presentation of the maintenance bond, which the Surety Company was willing to execute in the sum of $28,000, for a period of one year. After some correspondence about details now immaterial, and having received the bond, the complainants paid the balance of the contract price, excepting $1000, which was retained by them to cover any unpaid bills and take care of any expense incident to leaks which had developed in the basement of the building. At that time there was no evidence of imperfect workmanship or defective materials that meant a weakened structure, and the leaks in the basement were not thought to be serious. During this time the Stone Engineering Company made efforts to remedy this defect. These efforts continued for more than a year after the second bond was delivered to the complainants. On July 8, 1925, Mr. Hale wrote to Mr. Stone that there was a leak from the roof into the bins. This was the first complaint of leaks other than in the basement. Thereafter incessant complaints were made of such leaks by complainants, coupled with demands that the leaks be remedied. It appears that the leaks in the basement were seepage through the basement floor. They were not shown to have come through the foundation walls, which the Stone Engineering Company made waterproof pursuant to the contract.

The original contract contained, as aforesaid, a provision that in making payments from time to time on estimates of the value of the materials delivered and work done, the complainants would retain fifteen per cent of the amounts thereof until completion and acceptance of the work. The first, or performance, bond contained the express condition, "That the Obligee shall faithfully perform all the terms, covenants, and conditions of such contract on the part of the Obligee to be performed; that the Obligee shall retain that portion, if any which such contract specifies the Obligee shall or may retain of the value of all work performed or materials furnished in the prosecution of such contract (not less, however, than ten per centum of such value), until the complete performance by the Principal of all the terms, covenants and conditions of said contract on the

Principal's part to be performed; that no change shall be made in the plans, specifications, terms, covenants and conditions of such contract which shall increase the amount to be paid the Principal more than twenty per centum of the penalty of this instrument without the written consent of the Surety.''

It is insisted that the settlement of May 8, 1925, was made upon the urgent request of the Surety Company and that it is thereby estopped to claim, as it did claim, that the complainants violated a condition of the first bond when they paid out all the balance excepting $1000 in May, 1925. It will be remembered that the Surety Company's manager, in his letter making this request, conditioned it upon the complainants being satisfied that the elevator had been completed in accordance with Mr. Stone's statement that it had been completed and all bills had been paid. With this condition before them the complainants paid out the money which the contract provided should be retained until the work should be completed and accepted.

By this transaction the Surety Company gave up the protection afforded by retaining fifteen per cent of the compensation to the contractor, relying upon an acceptance of the work as substantially performed, provided that the complainants have the security of a bond guaranteeing against defects which might appear within one year from the time the elevator was completed and ready to receive grain. The complainants accepted the bond as a substitute for holding the money and as a protection against defects which might appear.

The rule is that an acceptance may be expressed, or it may be implied from the conduct of the owner, although he might thereafter claim that he did not intend to make such acceptance. 9 C. J., 796 and cases cited.

In 6 R. C. L., pp. 991-992, the general rule is stated that where work is accepted with knowledge that it has not been done according to the contract, or under such circumstances that the knowledge of its imperfect performance may be imputed, the acceptance will generally be deemed a waiver of the defective performance, but this rule does not apply to latent defects. The acceptance of work which has been defectively done, the defects being unknown and not discoverable by inspection, does not amount to a waiver of the defective performance.

It is evident that not all of the defects, if they may be so called, were latent, though others may have been latent. The complainants evidently believed that whatever the defects might be, they would appear within a year from the date of the settlement and would either be remedied within that time or compensated for by the con-

tractor and his surety. They used the structures during that time for storage of grain. It was safely stored therein when the tanks were dry. The complainants continued to use them, having accepted them with a purpose to look to the guaranty of the bond for compensation for loss due to any defects. Loss was incurred, for grain was injured from leaks. If we assume that the walls were, by the contract, to be made waterproof, the complainants also suffered loss at the hands of the contractor for his failure to complete his contract by furnishing that for which complainants contracted. But the period of twelve months stipulated in the bond began to run upon the making of the settlement and the delivery of the bond. At that time the elevator was treated by the complainants as ready to receive grain, although possibly not complete; and any completion necessary, even to remedy latent defects, was safeguarded by the acceptance of the bond. The effect of the acceptance given was to fix the time when the period of guaranty under the second bond was to begin to run. If the complainants lost this protection by their failure to sue on the bond while their rights were alive, it is but their misfortune.

The limitation therefore expired in August, 1926, unless it was waived or the time was extended, by the surety, to the date of the institution of this suit. The proposition that there was an ambiguity construable against the surety has been determined adversely to the complainants in the conclusion that by the transactions of May, 1925, the period of twelve months then began to run; for the complainants then accepted the elevator under an agreement that should it within twelve months appear defective and not complete, they would look to the surety to compensate in damages—the equivalent of completion and use. Thereafter the complainants must look to the second bond for protection, having designated one year as the period for appearance of defects and three months more in which to bring suit on the bond.

The complainants find a waiver or extension in acts or conduct alleged to have induced delay in bringing suit. They insist that they were lulled into security by correspondence and other negotiations, so that the Surety Company is estopped to rely on the contractual limitation. Of course, a party is estopped to assert such limitation where he induces the other party to delay commencing suit, and such a limitation by contract should be construed with strictness against the party invoking it. 37 C. J., 729. But in order to bind the surety the waiver must be made by the surety. 50 C. J., 200, and cases cited. The facts must be examined to determine whether or not the surety by acts, conduct or agreement waived or extended the limitation.

There is no evidence that at any time the Surety Company requested the complainants not to sue or agreed to pay anything to them. It is the general rule that the acts to constitute a waiver by implication must be done during the running of the period of limitation, not after it has expired and the rights of the parties have become fixed. 14 R. C. L., 1424; Everett v. L. & L. Ins. Co., 142 Pa. St., 332, 24 A. S. R., 499. In Beatty v. Lycoming, etc., Ins. Co., 66 Pa. St., 9, 5 A. S. R., 318, it was said by Judge Sharswood:

> "To constitute a waiver, there should be shown some official act or declaration by the Company, during the currency of the time, dispensing with it,—something from which the assured might reasonably infer that the underwriters did not mean to insist upon it . . . After the thirty days had expired without any statement nothing but the express statement of the company could renew or re-vivify the contract."

In September and December, 1925, complainants were requested by letters from the office of the vice-president and manager of the Surety Company, to state formally whether or not the contract had been completed and the first bond had served its purpose and could be cancelled on its records. These were "form" letters written by a clerk, in order to procure evidence of the completion and acceptance of the performance of the contract, to be filed in the home office of the Company as required by the Insurance Commissioner. They were written after the period of limitation for action on the bond had expired. Complainants refused to make such a declaration and declared that if the contractor did not comply in the very near future with the terms and provisions of the building contract, they would be compelled to invoke protection afforded them by the bonds. These letters from the Surety did not contain any waiver or agreement for extension of the time to sue on the first bond.

On December 30, 1925, complainants wrote to the Surety Company that they would have to look to the two bonds covering the proper execution of the contract. This was referred to the Company's St. Louis Claim Department, but it made no reply. In January and February, 1926, complainants wrote three other letters to the Surety Company, complaining of failure of the Stone Engineering Company to remedy defects, and stating that they would expect the Surety to compensate. for their losses. Each time the Surety Company replied that it had referred the matter to their St. Louis Claim Department. On April 2, 1926 complainants by letter to the Surety Company declared that additional loss had been incurred from defects, and stated that they would have to look to it for any and all loss sustained.

On April 6, 1926, the Surety Company by its attorney formally by letter notified complainants that it denied liability on the first

bond, because complainants had failed to observe the terms of the contract with reference to the matter of retaining the proper percentage on payments made to the contractor; and because the contractor would not be responsible for defects or leaks which might have developed on work properly performed in compliance with the plans and specifications, and therefore due, not to any fault on the part of the contractor, but rather through failure of plans and specifications to accomplish the result then desired.

This letter contained no admission of liability on the second bond.

On May 14, 1926, the Surety Company's president wrote the complainants in reply to their intimations that the Company was attempting to evade its contractual obligations under the first bond and had taken advantage of a technical defense. He called attention to the provision in the contract for retention of fifteen per cent of the contract price until the entire work was completed and accepted, as a condition precedent to any right of recovery on the bond. He stated that the Company must of necessity expect of the holders of their bonds their observance of all the conditions on their part to be performed. He concluded by stating that it was his understanding that the contractors were completing their work in accordance with their contract and he was very glad that the matter was working out in that manner.

The next correspondence between the Surety Company and the complainants was begun on August 24, 1926 when the complainants by their attorney wrote to the Surety Company setting forth defects in the construction of the elevator and the consequent loss to complainants, and declaring that unless something was done complainants would have the defects repaired and call upon the Surety Company to pay the damages theretofore suffered. To this letter the Surety Company replied on August 30, 1926 that the time provided for bringing action on the bonds had expired and he assumed that there was no action to be begun by the surety in connection with the matter.

Neither in this correspondence nor in any other transactions between complainants and the Surety Company was anything upon which the claim of waiver or agreement for extension could be predicated. The Surety never admitted liability, but denied it. It never held out to complainants any hope of an amicable adjustment after any delay. It was not obligated to call the attention of the complainants to the provisions limiting the time within which action could be brought. Its acts and declarations were not such as were calculated to mislead the complainants. There was no fraud or deception on its part. It follows that there was no waiver of the limitations or extension of the time within which to bring suit on the bonds.

474

In the view which we have thus taken of this case, it is unnecessary to determine whether or not the contract was completed according to the specifications—this question being made because the only specific reference therein to waterproofing related to the foundations.

The decree of the Chancery Court is affirmed. The costs of the appeal will be adjudged against the complainants and the surety on their appeal bond.

Faw, P. J., and Crownover, J., concur.