In re D. L. BOULDIN CONSTRUCTION CO., INC., Debtor.

C. Kenneth STILL, Trustee, Plaintiff,

v.

REGAL WOOD PRODUCTS, INC., Exchange Mutual Insurance Co., Fire Protection Systems, Inc., Gentry C. Newby, d/b/a Buck's Refrigeration & Air Conditioning, B & G Supply Company, J. C. Panter, d/b/a Custom Asphalt Paving Co., First Central Bank & Neal Electric Supply Co., Defendants.

Bankruptcy No. BK-1-79-01566.
Adv. No. 1-79-0044.

United States Bankruptcy Court,
E. D. Tennessee.

Sept. 30, 1980.

---

Scott N. Brown, Jr., Chattanooga, Tenn., for plaintiff.

Joe D. Carter, Smithville, Tenn., W. Wayne LeRoy, Nashville, Tenn., Frank Buck, Smithville, Tenn., B. G. Marks, McMinnville, Tenn., Ramon M. Adcock, Smithville, Tenn., Thomas C. McBee, Winchester, Tenn., for defendants.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

D. L. Bouldin Construction Company (Bouldin) contracted to build a building for Regal Wood Products (Regal). Bouldin filed a petition in bankruptcy after it ceased work on the building and deemed it complete. The trustee in bankruptcy for Bouldin brought this suit against Regal to collect an amount allegedly still owing to Bouldin and to enforce a lien for that amount on Regal's property.

Most of the other defendants were suppliers or subcontractors on the Regal job. Two were not. Exchange Mutual is the surety on Bouldin's payment and performance bonds for the Regal job. First Central Bank has a mortgage on Regal's property.

At the trial the parties generally agreed that the main question is whether the trustee on Bouldin's behalf can recover from Regal. They also agreed that certain subsidiary questions could be answered first if the court determined the date of completion of the building. The rights of the suppliers and subcontractors against Bouldin, Regal, Exchange Mutual, and First Central Bank were agreed to depend on the date of completion.

Relative to that question, the court finds the facts as follows:

## FACTS

In May, 1978, Regal and Bouldin entered into a contract providing for Bouldin to construct a "Stran" steel building with an area of 15,000 square feet. Bouldin began construction, apparently, in the summer of 1978.

Custom Asphalt Paving undertook to do the paving called for in Bouldin's contract with Regal. The paving was to be of rock and tar. Custom did the work in early November, 1978. Usually, to avoid having the heavy equipment on the paving, it is one of the last things done at a construction site. Custom knew that, because of when it was done, this paving would need some touch–up work in the spring.

Regal started moving machines into the plant in December, 1978. Fire Protection Systems began work on the sprinkler system that month. It did the underground work that month.

Fire Protection Systems continued with the inside work in January, 1979. Buck's Refrigeration and Air Conditioning had the heat operating in January, 1979. Regal was continuing to set up machines in the building.

In February, Fire Protection Systems completed installing the sprinkler system. Sometime in January or February, Regal hired an electrical contractor to install electrical connections for the machines. That job was completed by February 26, 1979.

On February 26, 1979, John C. Daniels, president of Regal, wrote a letter to D. L.

Bouldin complaining that some work had not been done and some repairs were needed. The letter has been referred to as the "punch list". Besides listing work to be done and repairs, it points out that Regal itself hired and paid the electrical contractor to make the machine connections.

Among other items, the letter listed the following defects and work to be done (paraphrased from letter):

1. The gravel and tar on the parking lots was improperly done and needs to be totally re-done.
2. Front windows and door leak when it rains.
3. Heating system for office and hallway is inadequate and needs more feed-ducts.
4. Sewer lines were not connected to the city sewer system.
5. The condensing unit for the air conditioning has not been installed.
6. The outside building for finishing materials has not been completed.
7. The awnings over the loading dock and overhead door need to be replaced because one has fallen off and the other is bent out of shape.
8. Roof leaks are causing damage to equipment, materials, finished goods, machinery, and the building.
9. Roof vent leaks are also causing damage.
10. The grading on one side of the parking lot is too high and causes water to run into the building, damaging materials.
11. Leaks in the sprinkler system are causing damage to the ceiling and carpet.

Generally the other items in the list called for minor repairs or work to be done or are no longer in dispute.

In March, 1979 Buck's Refrigeration and Air Conditioning installed a condenser for the air conditioner, but it was the wrong condenser and was removed. Buck's also added some ducts and corrected some already installed.

Sometime around the end of February or the beginning of March, 1979, a trench was dug for the sewer line connections. The bill is dated March 3, 1979. Apparently the sewer lines were connected in March.

In early April, 1979, Custom Asphalt Paving returned to the site with a work crew, a tank load of oil, four or five truckloads of gravel, and a twelve-ton roller. Custom repaired some soft spots and attempted to correct the grade where it allegedly was too high. On April 19, 1979, John C. Daniels signed a letter accepting Custom's work, subject to approval by D. L. Bouldin. The work in early April was the last work done at Regal by Custom Asphalt Paving.

In late May and early June, 1979, Fire Protection Systems returned to repair the leaks in the system. It also raised some pipes so that an area could be used for office space. (Apparently this was the overhead office space created pursuant to a contract modification of October 27, 1978.) Fire Protection Systems also installed the signs that go with a sprinkler system. Its last day on the Regal job was June 6, 1979.

Around June 1, 1979, Buck's returned and installed another condenser for the air conditioner. It was the right condenser, but Buck's didn't have a circuit breaker needed to operate the system. Bouldin was responsible for furnishing the breaker. The breaker could not be bought locally but was ordered from Neal's Electric Supply Company. Sometime between June 1 and June 19, 1979, the breaker was delivered. Installation of it was a short job. But Buck's employees spent all of June 19 at Regal doing the final hook-up and testing of the air conditioning.

After the punch list was received, employees of Bouldin were at Regal at various times to do the work or repairs for which Bouldin admitted responsibility. Keith Bouldin could not recall exactly when crews were at the Regal job between February, 1979 and June 11, 1979, the last day that any of Bouldin's employees worked at Regal. He testified that Bouldin's employees had to "work around" Regal's employees in January when they were setting up ma-

chines and that the building was useable on March 1, 1979, except for minor work and repairs. Daniels testified that he wrote the punch list letter in late February because the things needed to be done, but Bouldin's employees had disappeared. John Venier was associated with Regal during the first half of 1979. He testified that Bouldin repaired and did most of the work within about a month after the letter or by the end of March, 1979. John Daniels' testimony was to the same effect.

On June 8, 1979, D. L. Bouldin wrote a letter to Regal asserting that the job was substantially completed, except for some minor repairs, and that the contract work and repairs called for in the punch list had been completed. The letter did not mention that the air conditioner still did not work.

On June 11, 1979, the letter and Keith Bouldin and a few other men arrived at Regal. The men cemented some concrete blocks under a transformer pad, fixed some leaks, caulked around some windows, and re-hung a door. That was the last day that any of Bouldin's employees worked at Regal.

There was some controversy as to when the machines in the plant were operable. Daniels testified that they ran in January. It was in January or February that the electrical contractor hired by Regal installed the electrical connections for the machines. There was testimony that the machines would not run on the temporary electric service installed during construction but needed "three phase" current that would be part of the permanent service. No one was certain when the permanent service was connected. Mr. Newby knew that it was not connected on January 1, 1979 but was connected in March when his employees installed the wrong air conditioner condenser. It appears that the machines were operable, at the latest, sometime in February, before Daniels wrote the punch list letter.

Mr. Daniels could not say how many employees Regal had in January, 1979. He testified that the building was useable in February when he wrote the punch list letter. In March there were six to eight employees other than Mr. Daniels himself. Keith Bouldin was sure that Regal was in production about two weeks before June 11, 1979.

Mr. Daniels also testified that having an operating air conditioner was a material part of the contract with Bouldin. The contract provides only specifications.

In this proceeding Regal asserted substantial set-offs against Bouldin because of defects in the construction. Regal introduced testimony in support of its contention that it would require $10,203.00 in further work and repairs to make the building meet contract specifications as to the basic structure.

Regal's witness admitted that he made the estimate high because of the number of trips to the plant to correct some defects was indefinite.

Regal also contended that it was entitled to other set-offs against Bouldin and various sub-contractors:

| | |
|---|---|
| Electrical Corrections | $ 925.00 |
| Sprinkler Corrections | 125.00 |
| Paving Corrections | 4,500.00 |
| Total | $5,550.00 |

As to B & G Supply, its last invoice for the Regal job is dated March 21, 1979 and shows a delivery date of March 1, 1979. Keith Bouldin verified that the materials were for the Regal job and that the purchase was authorized. B & G did not attempt to establish a lien on Regal's property.

Various exhibits show that Neals Electric Supply, Buck's Refrigeration and Air Conditioning, and Fire Protection Systems all gave notice of lien to Regal and Bouldin within 90 days after July 19, 1979. The exhibits also show that all filed suits after giving notice and had writs of attachment issued against Regal's property.

## DISCUSSION

First Central Bank admitted that if any of the subcontractors or suppliers had liens on Regal's property, then they would be superior to its mortgage. All of the sub-

contractors and suppliers, except B & G Supply, attempted to establish liens on Regal's property. After hearing the proof, the court concluded that the building was completed on June 19, 1979, when Buck's made the air conditioning system operable.

Based on the court's decision the subcontractors and suppliers, except for Custom Asphalt Paving, reached agreements with Regal, Exchange Mutual, and Bouldin as to the amount of judgments against them and the validity of liens on Regal's property. The court has entered orders in accordance with those agreements. The court said that it would issue a written memorandum of its decision, as required by Bankruptcy Rule 752. This is it.

The date of completion is significant in the mechanics' and materialmen's lien statutes. Tenn. Code Ann. §§ 64–1101–1158 (Repl.Vol.1976). Mechanics' and materialmen's liens are provided for laborers, contractors, and suppliers·whose work or goods improve real property. Their purpose is to encourage construction by securing payment to builders and suppliers. Note 5, Memph. St.U.L.Rev. 359 (1975).

But the right to establish such liens must be limited so that their threat does not decrease the value and transferability of improved real property. The statutes have therefore set up strict procedures for establishing the liens. That is particularly true as to lien claimants who did not deal directly with the owner of the property, such as the lien claimants in this case, except Bouldin.

Notice of the lien claim is the first step in establishing the lien. Notice must be given within one of two 90–day periods–90 days after the subcontractor or supplier completes his contract or is discharged or 90 days after the improvement is completed. Tenn. Code Ann. § 64–1115.

The legislature picked logical beginning dates for the notice periods. A subcontractor or supplier cannot lose its lien rights before it completes its contract. But typically that will occur before completion of the improvement, and so, the date of completion will begin the time for the final reckoning as to lien claims.

The date of completion should be determined in light of its place in the statutory scheme. At some point the owner, or third parties dealing with him, must be able to say that there can be no valid lien claims other than those for which notice has already been given. But the date must also be one that subcontractors and suppliers should reasonably have expected.

■ The cases offer some guidance. Facts indicating completion are:

The building is substantially finished.

The contractor has abandoned work on the building.

The owner or a tenant has taken possession and begun to use the building.

Only minor work, not of the essence of the contract, remains to be done.

*Luter & Daniel v. Cobb*, 41 Tenn. (1 Cold.) 525 (1860); *East Lake Lumber Box Company v. Simpson*, 5 Tenn.App. 51 (1927). Cf. *Cooper v. Hunter*, 569 S.W.2d 852 (Tenn. App.1978); *Wood v. Haney*, 41 S.W. 1072 (Tenn.Ch.App.1860).

Facts indicating that the building is not complete are:

The contractor abandons the job after a dispute with the owner and before completing his contract.

The building has serious defects.

Some .work that is of the essence of the contract remains to be done.

*Harrison v. Knafle*, 128 Tenn. 329, 161 S.W. 1003 (1913); *East Lake Lumber Box Company v. Simpson*, above.

■ An agreement between the owner and the contractor may control when the building is complete for their purposes. But under the lien statutes and as to third parties, the date of completion may occur earlier if the remaining work is minor and not of the essence of the contract. *Luter & Daniel v. Cobb*, above. On the other hand, it has been said that a building is not complete if work that is of the essence of the contract remains to be done, even though the work is minor and inexpensive. *Harris v. Knafle*, above. That rule, however, is

somewhat in doubt. See *Cooper v. Hunter*, above.

█ Regal started moving machinery into the building in December, 1978. By March, 1979 it had most of its machinery in. But while it was moving in, work was still being done on the building. It was not shown when, before late February, or early March, Regal had electric service and machine connections necessary to operate. In late February the sewers were not connected to the city sewer system. Apparently the connection was made around late February or early March.

After the punch list letter (February 26, 1979), Bouldin and its subcontractors undertook to do the work or make the repairs called for, at least to the extent that they admitted a contractual obligation.

In March Buck's installed and removed an air conditioner condenser and did some ductwork. Custom Asphalt Paving undertook repairs of the paving in April. In May and June, Fire Protection Systems corrected leaks and moved some pipes to accommodate added office space. It put on the final touches, such as installation of the signs, in early June. About that time Buck's returned and installed the correct condenser for the air conditioner. D. L. Bouldin wrote a letter to Regal asserting compliance with its contract, though he failed to mention that the air conditioner still didn't work. Bouldin's employees did their last work at the building on June 11, the day the letter arrived. About a week later, Buck's completed the air conditioning system.

It should have been apparent that Bouldin and the subcontractors considered their contracts complete then and would do no further work on the building. The court concludes that the date of completion was then, June 19, 1979, when Buck's made the air conditioning operable.

A good argument can be made for March, particularly from Regal's and Exchange Mutual's point of view. Even the Bouldins admitted that the building was substantially finished in March.

But, in its punch list letter of February 26, Regal contended that there were serious defects in the construction and substantial work still required under the contract. Of course, a claim of defects or defects themselves do not make a building incomplete for the purposes of the lien statutes. It may be incomplete if the defects are serious and the contractor abandons the work. Cf. *East Lake Lumber Box Company v. Simpson*, above.

But in this case Bouldin and the subcontractors undertook further work. March was not the end of construction but a turning point. From March through June 19, Bouldin or the subcontractors were regularly working on the Regal building. On that date the last work was done pursuant to the contract. Furthermore, this dispute is essentially between the subcontractors who were working at the building and its owner, Regal. Daniels, president of Regal, called for substantial further work in late February, 1979. He could not have helped knowing that the subcontractors and Bouldin worked regularly at Regal through June 19, 1979. Regal has since contended that the construction has substantial defects. It has not been seriously argued that the building is therefore still incomplete. See *East Lake Lumber Box Company v. Simpson*, above. But Regal should not be heard to complain that the June date of completion is a surprise. It rewound the mechanism in March and it didn't wind down until June.

In summary, on June 19, 1979, the building was substantially finished, the contractor and subcontractors abandoned the work, and as far as they were concerned no work remained to be done that was of the essence of the contract. If the building was completed, it was completed then.

Based on a completion date of July 19, 1979, Regal, Bouldin, and Exchange Mutual agreed that Buck's Fire Protection Systems, and Neals Electric have valid liens on Regal's property and that Exchange Mutual is liable to B & G Supply. Orders have been entered accordingly.

## PART 2

The remaining disputes in this case concern the rights and liabilities of Bouldin, Custom Asphalt Paving, Regal, and Exchange Mutual. The court will deal first with the issues on which the proof is clearest.

■ Regal contends that it is entitled to a set–off against Bouldin of $2,546.13, which it paid to an electrical contractor to do work that Bouldin allegedly was obligated to do. The work was the electrical hook–up of Regal's machines. In the punch list letter, Daniels said that he had given Bouldin a list of machines so that it could do the hook–up. In his reply (June 8, 1979), D. L. Bouldin denied that the contract obligated Bouldin to make the hook–up and denied that Bouldin ever implied such an obligation. He pointed out that "[m]achine power loading was requested so that the size of the electrical service could be determined and an outline of machines put on drawings so that bus duct and wire lengths could be determined for design and purchasing." D. L. Bouldin also testified that he didn't have a list of machines when the bid was made and so could not have based his bid on having to do the hook–up.

The written contract provided:

*Electrical* consists of a 400 [Amp?] 30 480W service entrance bus duct, sodium high pressure fixtures in plant, fluorescent lighting, in office duplex outlets etc. as shown on drawings. Power capacity is provided to a point near spray booth and drying oven (furnished and installed by others) based on 20 KW for oven and 5 KW for booth.

The court concludes that Bouldin was not obligated to make the machine hook–ups. What one party to a contract thinks the other is obligated to do does not make it part of the contract. Regal is not entitled to a set–off.

That is also true as to the alleged $75.00 set–off for the cost of digging a sewer line trench. The written contract clearly provided for plumbing "only to a [point] 5′–0 outside of building." Bouldin apparently made the sewer connection at Regal's insistence but was not obligated to do so under the original contract. Bouldin claimed the right to recover the added cost from Regal, not including the $75.00 paid by Regal. If Bouldin is entitled to recover, then Regal cannot recover the $75.00. The court will deal with Bouldin's claim later.

■ Custom Asphalt Paving did the initial paving in November, 1978. In February, 1979, Regal complained that the paving needed to be completely re–done and that it caused water to run into the building in one back corner. Custom undertook repairs in early April, 1979. On April 19, 1979, Daniels, on behalf of Regal, signed a letter accepting the paving but only to the best of his knowledge and subject to approval by D. L. Bouldin. In his letter of June 8, 1978, D. L. Bouldin indicated that the paving was acceptable.

Regal alleged two defects in the paving despite Custom's repairs–first, that water still runs into the building and second, that the pavement cannot be paved over.

The evidence did not support the first allegation. John Venier testified that when he left Smithville in July, 1979, water did not run into the building from the pavement. Keith Bouldin went to the building in May, 1979, during a rainstorm, and saw no water running into the building from the pavement. Levie Waldie, Regal's witness, testified only that water ran toward the building at one back corner. R. Thomas DeBerry's repair estimates pointed out a roof leak at one back corner, perhaps the one where water allegedly runs into the building. The court concludes that water may run toward the building but does not run into the building as alleged.

Apparently it was part of the contract that the pavement called for would be left low enough that it could be paved over. (Testimony of John Daniels and Keith Bouldin). That was not in the written contract

introduced into evidence. But the plans and specifications were not introduced and may have included that requirement.

Custom Asphalt Paving did not do the site grading. It did only grading, "clipping the dirt", in preparation for paving.

Levie Waldie testified that water ran toward the building at one back corner and that the pavement was too high in some places to be paved over. He also testified that there were some soft spots. He estimated that it would cost $4,500 to re–grade and re–base the pavement so that it could be paved over.

The court is of the opinion that Regal is not entitled to a set–off against Custom Asphalt Paving. It does not appear that Custom was responsible for the alleged defect. It did not do the site grading. Apparently that was to be done so that the pavement would be low enough to be paved over. The contract between Bouldin and Regal provided:

> *Site Grading* includes . . . grade and compact subgrade to elevations required to established building pad, drives and parking as per plans . . . .
>
> *Paving* Approx. 4300 sy of double bituminous treated paving as per Tenn. Hwy. Dept. specifications in areas shown on drawings.

Custom apparently undertook only the paving part of the contract.

Furthermore, Regal accepted the paving. Daniels' letter provided for acceptance subject to D. L. Bouldin's inspection. Bouldin approved the paving. The effect was acceptance of the paving by Regal and Bouldin. Of course, neither Bouldin nor Regal thereby waived any rights against others as to this defect, which was apparently not Custom's fault. See *Union Oil Co. v. Kennon Construction Co.*, 502 F.2d 792 (6th Cir. 1974); *J. R. Hale & Sons v. R. C. Stone Engineering Co.*, 14 Tenn.App. 461 (1932).

The result is that neither Regal nor Bouldin is entitled to a set–off against Custom, but Regal is entitled to a set–off against Bouldin because of defective performance of the general contract. Regal did not waive its rights by acceptance. Daniels continued to complain to Bouldin after Custom's repairs, but not repeatedly, since he expected no action.

Mr. Waldie's testimony is the only evidence as to the cost of repairing the pavement. He observed the pavement more than 18 months after it was first put down and about 14 months after Custom's repairs. It is not clear whether in that time anything could have happened that might cause the pavement to be too high. The effects of use and weather might account for part of the problems. Though there was no testimony, the court hesitates to say that all of the problem should be attributed to defects in performance of the contract. The estimate for repairs should be reduced rather than totally disallowed. Accordingly Regal is allowed a set–off of $2700.00.

Regal alleged the right to other set–offs for repairs needed to the sprinkler system and the electrical system. The only proof as to these were estimates attached to Regal's trial memorandum. There was no testimony in support of these alleged set–offs. Therefore, the court finds the proof insufficient to support them.

Regal also contended that it is entitled to set–offs totaling $10,203 for the cost of correcting defects in the basic structure.

R. Thomas DeBerry made the estimates and testified in support of them. He admitted that he made the estimates high because it was difficult to estimate how many trips to the building would be required to correct some of the problems, particularly leaks.

Taking that into account, the estimates appear to be high for other reasons. The cost of labor is estimated as $15 per hour for all work, apparently without regard to whether skilled or unskilled labor would be required. Further the number of hours required appears exaggerated.

| Repairs | Labor ($15/hour) | Time Estimates |
|---|---|---|
| Roof leaks | Unskilled | 160 hours or 5 people working 4 eight hour days |
| Window leaks | Part skilled (dry wall work) | 128 hours or 4 people for 4 eight-hour days |
| Concrete floor | Part skilled | 124 hours or 4 people for 3 days and 7 hours |
| Rubber wall closures | Unskilled | 40 hours or 2 people for 2.5 eight hour days |

The estimates also included the cost of re–installing a canopy at a rear door. Regal complained about the canopies in the punch list. Bouldin thereafter re–installed them. According to John Venier they were re–done so that they would not come down. There is thus a difference of opinion as to whether this alleged defect needs correcting. Accordingly the court will allow no set–off as to it.

Furthermore it is not clear that Bouldin should be held responsible for all the alleged defects. At the time of the trial the roof had been on the building for at least 18 months. Mr. DeBerry testified that screw placement in the roof panels was not according to specifications and that caulking was in the wrong places. He did not testify that the screw placement would cause more leaks than usually can be expected or that more leaks than usual had occurred. His written estimate does not state the number of roof leaks that he found. After a time some leaks must be attributed to normal wear and tear.

Mr. DeBerry also testified that part of the concrete floor vibrated when machinery was rolled across it. He did not testify that it was therefore unuseable by Regal or that it would not last.

The court generally accepts Mr. DeBerry's testimony as to the existence of the defects for which he made estimates. Nevertheless, the court cannot ignore the testimony of John Venier. He testified in general that earlier complaints as to alleged defects were not always faith. Having "cried wolf" without cause, Regal should not expect the unconditioned aid of the court when the wolf does appear.

Taking into account the exaggeration in Regal's estimates, the suspicion cast by its prior actions, and the lapse of time, the court concludes that $4,000.00 is a reasonable set–off, as the cost of necessary repairs due to non–performance of the contract.

The trustee claimed that Bouldin is entitled to payment for extra work done at Regal's request (or insistence) but not called for in the contract. The trustee relied on D. L. Bouldin's letter of June 8, 1979, as setting forth the extra work. Regal's defense was essentially that the work claimed as extra was required by the contract. Daniels testified that the only extra work was that added by the three written modifications to the contract. He did not deny that the allegedly extra work had been done.

It is clear from the contract that Bouldin was not obligated to do the work set out in paragraphs 2, 9, and 10, of D. L. Bouldin's letter of June 8, 1979. (Paragraph 2 has to do with the sewer connections.) Bouldin also was not obligated to pay the permit fees set out in paragraph 6. The court cannot determine from the contract in the record whether Bouldin was obligated to install outside water hydrants or a laundry sink (¶'s 1 and 3). As to the extra paving (¶ 8), Daniels didn't know about it. Jimmy Yates was not asked about it. Custom did not ask for payment for it. The court concludes that Bouldin is entitled to payment for the extra work and fees set forth in paragraphs 2, 6, 9, and 10 of D. L. Bouldin's letter. The total of those, as taken from the letter, is $752.50.

The trustee also claimed that Bouldin should be allowed to re–add a 2% discount allegedly used in figuring the original contract price. The contract did not mention such a discount. It did provide for a 1½% per month late charge on overdue payments. The trustee did not argue for recovery of late charges. In light of that, Regal did not continue to dispute the 2% discount. Bouldin is therefore entitled to re–add $3,704.08.

**298**

The court concludes that Bouldin substantially performed the contract and Regal accepted the building. See *J. R. Hale & Sons v. R. C. Stone Engineering Co.*, above; *Mullins v. Greenwood*, 6 Tenn.App. 327 (1927). Bouldin is entitled to payment of the contract price less the cost of correcting defects in the construction. *Marus v. Suzore*, 7 Tenn.App. 522 (1928). Bouldin is also entitled to payment for the extra work done at Regal's request and adequately shown by the evidence. Cf. *Beaty v. Brock & Blevins Company*, 319 F.2d 43 (6th Cir. 1963); *W & O Construction Co., Inc. v. City of Smithville*, 557 S.W.2d 920 (Tenn.1977); *Bannon v. Jackson*, 121 Tenn. 381, 117 S.W. 504 (1908); *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422 (Tenn.App.1979); *Pitt v. Bacherig*, 43 Tenn.App. 273, 307 S.W.2d 798 (1957); *Wrinkle v. J. F. LaRue & Son*, 9 Tenn.App. 161 (1928); *Fisher v. Edgefield & Nashville Mfg. Co.*, 62 S.W. 27 (Tenn.Ch.App.1900); *McEwen v. Mayor, etc. of Nashville*, 36 S.W. 968 (Tenn. Ch.App.1896).

The following accounting sets out the rights and liabilities of Bouldin and Regal:

| | | |
|---|---|---|
| Original contract price | | $181,500.00 |
| Written charge orders | | 7,928.00 |
| Extra work | | 752.50 |
| Re-add 2% discount | | 3,704.08 |
| | | $193,884.58 |
| | | |
| Less Payments | $170,871.60 | |
| Set-offs | 6,700.00 | 177,571.60 |
| | | |
| Due Bouldin | | $ 16,312.98 |

### LIEN CLAIMS

The record shows that Custom Asphalt Paving gave notice of its lien within 90 days after Bouldin completed the building. Within 90 days after notice, Custom filed suit to enforce the lien and had issued an attachment of Regal's property. Custom perfected a subcontractor's lien on Regal's property.

The court has found nothing in Exchange Mutual's bond that relieves it from the obligation to pay Custom as it agreed to pay the other lien claimants after the decision as to the date of completion.

Bouldin also asserted a lien on Regal's property. But to the extent it pays valid lien claims, Exchange Mutual's rights are superior to Bouldin's. The amount of valid lien claims determined in this suit exceeds the amount that Regal owes Bouldin. A decision as to Bouldin's lien claim is therefore unnecessary.

Exchange Mutual will be entitled to a claim against Bouldin for the amounts that it pays the subcontractors and suppliers in accordance with this opinion.

Orders will be entered accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.